IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| SEAN BARNETT § | |
| § | |
| VS. § | CIVIL ACTION NO:5:22-CV-818 |
| § | |
| UNIVERSITY OF TEXAS HEALTH § | |
| SCIENCE CENTER AT SAN § | |
| ANTONIO, SHWETA BANSAL, AND § | |
| STEPHANIE LEVINE § | |

**PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND**

**TO THE HONORABLE JUDGE OF SAID COURT:**

**NOW COMES** Plaintiff, Sean Barnett, complaining of and about Defendants University of Texas Health Science Center at San Antonio (UTHSCSA), Shweta Bansal, and Stephanie Levine. Barnett alleges a deprivation of rights due to his exercise of his rights under the First Amendment and for defamatory/libelous statements made about him and for cause of action shows unto the Court the following:

**I.
NATURE OF SUIT**

1. This is a civil action for monetary relief for injuries sustained by Capt. Sean Barnett as a result of Defendants' retaliatory acts against him in violations of the First and Fourteenth Amendments to the Constitution under 42 U.S.C. §1983 and for defamatory slanderous and libelous statements made against Plaintiff by Defendants.

**II.
PARTIES AND SERVICE**

2. At all material times related to the incidents described below, Capt. Barnett was a student at UTHSC-SA in San Antonio, Bexar County, Texas, where he resided.

3. Defendant University of Texas Health Science Center at San Antonio (UTHSCSA) is a federally-funded institution of higher education located in San Antonio, Bexar County, Texas. UTHSC-SA may be served with process by serving its Chief Legal Officer Jay Rossello - Office of Legal Affairs, MSC 7837, 7703 Floyd Curl Drive, San Antonio, Texas 78229-3900.  A waiver of service has been requested

4. Defendant Shweta Bansal is an individual residing in San Antonio, Bexar County, Texas she may be served with process at Office of Legal Affairs, MSC 7837, 7703 Floyd Curl Drive, San Antonio, Texas 78229-3900.   A waiver of service has been requested.

5. Defendant Stephanie Levine is an individual residing in San Antonio, Bexar County, Texas she may be served with process at Office of Legal Affairs, MSC 7837, 7703 Floyd Curl Drive, San Antonio, Texas 78229-3900.   A waiver of service has been requested.

### III.
### JURISDICTION AND VENUE

6. This Court has jurisdiction to hear the merits of Plaintiff's claims under 42 U.S.C. § 1983 as they arise under federal statute and the United States Constitution.

7. When Capt. Barnett alleges that UTHSCSA committed any act or omission, he means that UTHSCSA's officers, directors, trustees, principals, vice-principals, agents, servants, and/or employees committed the act or omission and that that UTHSCSA officer, director, trustee, principal, vice principal, agent, servant, and/or employee committed the act or omission in the course and scope of his or her employment with UTHSCSA and with UTHSCSA's full authorization, approval, and/ or ratification.

8. At the time of filing, damages are within the jurisdictional limits of this Court.

9. All the acts alleged herein occurred in Bexar County, Texas within the jurisdiction of the Western District of Texas, San Antonio Division.

10. Venue in this district and division is proper under 28 U.S.C. § 1391(b)(2).

## IV.
## MISNOMER/MISIDENTIFICATION

11. In the event that any parties are misnamed or are not included herein, it is Plaintiff's contention that such was a "misidentification," "misnomer," and/or that such parties are/were "alter egos" of parties named herein. Alternatively, Plaintiff contends that such "corporate veils" should be pierced to hold such parties properly included in the interest of justice.

## V.
## FACTUAL BACKGROUND

12. Plaintiff Capt. Sean Barnett joined the USAF while he was in medical school in 2012.

13. Barnett's career goal is to become a Kidney specialist and Intensive Care Unit practitioner.

14. Following the completion of his residency at Wright Patterson AFB/Wright State University in Ohio he applied for a Nephrology (kidney) fellowship at UTHSCSA in 2018.

15. The purpose of a fellowship is to further train and educate the doctor participating in the fellowship about a specific topic or specialty. As such the nephrology fellowship would provide Dr. Barnett with an opportunity to further his career goals.

16. Barnett was accepted into and started the fellowship in 2019.

17. During his time in the fellowship. Barnett began to raise concerns about patient treatment and safety to Dr. Shweta Bansal, the UT Health Nephrology Fellowship Program Director. These involved missed diagnoses, missed treatments, and missed tests. However, when Barnett would raise these concerns Bansal's response was to tell him not to worry about it.

18.     The third of these incidents occurred in summer of 2020.

19.     In August 2020 Barnett planned and set out a research project on fluids and blood pressure studying the impact of Covid-19 on heart failure. This project would be a retrospective study involving only chart review and would not pose any danger to patients or involve patient safety issues.

20.     Barnett knew that retrospective studies were common projects in the fellowship research environment.

21.     However, Dr. Shweta Bansal, the UT Health Nephrology Fellowship Program Director, refused to give approval the project and would not provide any reason why. No fellow can perform research without her approval so Barnett was unable to move forward.

22.     This was damaging to Barnett because if a fellow does not conduct research and does not publish any research they are considered inferior to other doctors who have. This negatively affects the doctor's ability to get competitive job positions, affects their future research opportunities, and affects their future pay.

23.     In November of 2020, Barnett's girlfriend was assaulted. He brought her to the ER at UT Health. Following that incident, UT health reported to the USAF that Barnett had been "high on drugs and aggressive towards staff," a false and defamatory statement.

24.     Barnett and his girlfriend complained to the hospital's patient relations department but nothing was done.

25.     Following the complaint Barnett was falsely accused of abusing his position to access his girlfriend's medical chart, which would violate HIPAA.

26. The Chief Compliance Officer for UT Health even told Dr. Woodson Jones, Vice-Dean of Graduate Medical Education at UT Health that they had a report from the Epic data system that Barnett had violated HIPAA and accessed the chart.

27. Jones then reported to Bansal that they had an Epic report proving that Barnett had violated HIPAA and that Barnett should be suspended from the program.

28. Bansal in turn reported the claimed Epic Report and HIPAA violation to Barnett's commanding officer, the flight commander, and the Chair of Medicine at Brooke Army Medical Center, Dr. Benjamin Morrow.

29. Bansal then ordered Barnett to tell her about the incident including his girlfriend's medical history and injuries despite the fact that Barnett was not comfortable disclosing the private information and was concerned about HIPAA violations.

30. The hospital made no attempt to confirm or verify these serious allegations before reporting them to Barnett's superiors in the USAF.

31. The compliance officer who had originally relayed the claims later spoke with Barnett and admitted that a mistake had been made, but went on to threaten Barnett that if he continued to pursue the matter that "If you keep asking questions, the microscope will be on you and who knows what they might find," which Barnett understood to mean that others would look for reasons to justify taking retaliatory action against him.

32. The compliance officer told Barnett that the mistake was an error in the Epic recording system. However Dr. Bansal and Dr. Morrow were both told that there was a record and actual proof of Barnett's alleged HIPAA violation, which was false.

33. Barnett requested a letter of apology, a plan to improve handling of these issues in the future and assurances that the situation would be corrected however none of this happened.

34. Within two weeks after the call from the compliance officer an ongoing PURIFY clinical trial that Barnett was involved in was stopped. He was told that there was a logistical issue getting the filters being used in the study, but the filters were being obtained directly from the manufacturer.

35. In January of 2021, Barnett had an ongoing COVID clinical trial that had been approved and had started treating patients. However, following his complaints about the report made following the incident with his girlfriend, the trial was shut down by UT Health and not allowed to resume for three months.

36. In May of 2021 Barnett raised a complaint about a "Sentinel" event to two providers and tried to file a patient safety report. Barnett found a life threatening misdiagnosis that put the patient at great risk.

37. Barnett reported to his supervisors Dr. Sharma and Dr. Wajeh Qunibi that he believed a patient was mistreated. A patient had a surgery after which a calcium check is required. Barnett knew that the patient may die if their calcium level was too low and it was therefore very important to check it. However, the patient's calcium was not checked for 14 hours after the surgery and when it was, the patient's calcium level was life-threateningly low. Additionally, a second patient was transferred out of the ICU with improper follow up resulting in another "Sentinel" event. That same patient required further hospitalization because of the improper follow up and had a second surgical ICE service miss an additional diagnosis that had a near fatal outcome. Barnett caught the errors both times, but was reprimanded for discussing them.

38. Barnett also reported the issue to the Joint Commission due to the severity of the failures. However he was told by Dr. Sharma that he could not file a safety report and that only an attending physician could, and that he needed to rescind the complaint.

39. Barnett applied for a $2 million grant to continue Covid research in May of 2021. However, the grant application was blocked by UT and no reason was given. This made no sense to Barnett because he was trying to get additional funding and it would not have cost UT anything.

40. While working in the ICU, Barnett had treated a patient who had been in the ICU for an extended period of time due to the severity of their condition. Even after he was done treating the patient he would occasionally contact them to support them and encourage them to continue with their physical therapy, which was common practice in the hospital.

41. In November 2021 Barnett brought concerns that the ICU patient was being worsened because they were placed on intravenous food despite being on dialysis. Barnett knew that dialysis patients should not receive IV food unless it was critically necessary because it could cause the patient's condition to worsen. Barnett would raise these complaints in emails however, the only result was that he was reprimanded, placed on administrative status, and not allowed to further treat the patient. Barnett was told by Dr. Levine that "you can't report things like that, you can't say things like that."

42. He was then given a shift over the New Years' weekend with only 48 hours' notice. He was also the only doctor on duty at the time.

43. In January 2022, Barnett raised patient safety concerns about a patient receiving an unnecessary risky treatment. He was reprimanded for bringing the concern and placed on "administrative status" within the fellowship.

44. The letter placing him on administrative status was signed by Dr. Levine and Dr. Proud.

45. Barnett also treated a patient who needed a calcium treatment over the new years' weekend. However, when Barnett ordered the Calcium however, the pharmacist blocked the order

without telling Barnett. Barnett did not find out until almost an hour later. The patient's condition worsened as a result, requiring a leg amputation and ultimately passing away.

46. In February 2022 Barnett was informed that a patient who had low oxygen and rapid breathing was arriving at the ICU. Barnett was concerned about possible heart or lung problems because the patient had a history of both COVID and heart disease.

47. The patient remained conversational and Barnett evaluated the patient as being at bigger risk from a heart issue than a lung related issue.

48. However, another ICU doctor arrived and determined that the patient needed to be intubated.

49. Following this incident Barnett was criticized for not making the decision to intubate the patient.

50. UTHSCSA used the incident as grounds to terminate Barnett from the fellowship claiming that he failed to recognize a critically ill patient despite only having two months of Medical ICU training.

51. On February 14, 2022, Barnett was dismissed from the Nephrology fellowship. He was accused of not recognizing critically ill patients, writing orders on jointly managed patients without discussing the cases with others, having "negative interpersonal interactions," and providing care outside the scope of the training program. The letter dismissing Barnett from the fellowship was signed by Dr. Levine.

52. It was further alleged that he had disrupted the training program and spoken "with a disparaging attitude" with members of the program and staff.

53. UTHSCSA reported all of the same information to Barnett's commanding officer causing the military to be far more suspicious that Barnett was the problem, made the military far

less likely to help him with his research or volunteer activities, and changed his future deployment to less desirable location and position.

54. UT has also locked Barnett out of his email, the email he used for many professional medical memberships, many publications, and many contacts with other doctors.

55. Barnett is now being harassed social media by someone from the hospital who is publicly posting confidential and private information.

56. Dr. Levine made false and defamatory claims about Barnett to Dr. Jones (ACGME) and Barnett's commander, Col. Thomas Brown.

57. Incorrect and defamatory statements were made by Dr. Levine and told to Dr. Jones claiming that Barnett had placed orders on patients that he was not treating, which was false. This statement was also told to the "Clinical Competency Committee" that supported the recommendation for dismissal.

58. They further claimed that Barnett was placing orders beyond his credentialed scope of practice, which was false and is very damaging to Barnett's career as a doctor.

59. False representations were made that Barnett disregarded the thoughts and opinions of others and continued to write orders without discussion.

60. Barnett was also falsely accused of providing care outside the scope of the Training Program despite receiving counseling against it.

## VI.
## CLAIMS UNDER 42 U.S.C. §1983 VIOLATIONS OF THE FIRST AND FOURTEENTH AMENDMENTS

61. Plaintiff was engaged in a Nephrology and Critical Care Fellowship at UTHSCSA prior to his dismissal from the program on February 14, 2022.

62. Plaintiff brought numerous complaints about false statements made about him and brought numerous complaints about improper patient care as discussed at ¶¶12-60.

63. Specifically, Plaintiff brought concerns about patient safety to Dr. Bansal through the summer of 2020 and as a result was denied research opportunities. This harmed Plaintiff by inhibiting his progress in the fellowship and hindered career advancement.

64. Plaintiff complained that his girlfriend received substandard care in November 2020 and as a result false accusations that he had used drugs and violated HIPAA were made to his supervisors and to the USAF. He was further told that if he continued to complain he would be retaliated against and the false accusations were not corrected or rescinded, hurting his reputation in the program and with the USAF.

65. Barnett complained about patient mistreatment in May of 2021 and as a result was not allowed to pursue funding opportunities. This harmed his progression both in the fellowship and in his career.

66. Barnett brought further complaints about how a patient was being treated in November 2021 and as a result was told that he should not bring complaints and was placed on administrative status and ultimately removed from the fellowship program.

67. Plaintiff was retaliated against by having research opportunities removed, being given inferior opportunities to others in the fellowship program and ultimately being dismissed from the program in retaliation for having brought complaints about patient treatment and safety, and for bringing complaints about false and defamatory statements made about him to his commanding officers.

68. On February 14, 2022, Plaintiff's participation in the fellowship was terminated by Defendant.

69. Defendants, and each of them, violated Plaintiff's right of free speech guaranteed by the First and Fourteenth Amendments to the United States Constitution made actionable pursuant to 42 U.S.C. § 1983 by terminating his participation in the fellowship.

### Damages for Violation of Constitutional rights

70. As a result of Defendants' violation of his Constitutional rights Plaintiff has suffered damages including loss of future earnings as well as mental anguish, inconvenience, and harm to reputation.

71. Plaintiff further seeks attorney's fees.

## VII.
## DEFAMATION

72. Plaintiff repeats, reiterates, and realleges each and every allegation contained in ¶¶10-60 of this Complaint as if fully set forth at length here.

### Defendant Bansal's Defamatory Statements

73. Shweta Bansal, defendant, stated orally that the Plaintiff had violated HIPAA and improperly accessed his girlfriend's medical records when he had not.

74. Bansal made statements to Barnett's Commanding officer Dr. Benjamin Morrow were made that "We have proof Barnett violated HIPAA."

75. Defendant Bansal reported to Plaintiff's commanding officers that he had violated HIPAA, a serious breach of professional responsibility, and that there was proof in the Epic system. This was not true. Defendant Bansal recklessly made the damaging statement without verifying whether it was true.

### Bansal's Statements Were False

76. The defamatory statements set forth above are false. The truth is that Barnett did not improperly access his girlfriend's medical records in violation of HIPAA, nor was there

evidence in the Epic system that he had done so. When first informed of the false statements, he immediately sought to have them corrected. However, he was told that if he continued to pursue the matter that he would be retaliated against.

### Statements Were Made With Culpable State of Mind

77. Defendant Bansal made the false and defamatory statements above by recklessly failing to ascertain the truth. The Defendant knew these statements to Barnett's commanding officer would be harmful to him, but failed to take any steps to verify what happened..

### Statements Were Made With Actual Malice

78. Furthermore, defendants published the defamatory statements with actual malice, in that they either knew that they were false or they acted with reckless disregard as to the truth or falsity of the statements.

79. The publication of the defamatory statements was not privileged because Defendant made the statement recklessly.

### Statements Were Published

80. Defendant Bansal published the defamatory statements set out above when they made the statements to Plaintiff's commanding officers. All of the persons who heard the defamatory statements understood that the statements were defamatory in the manner described above.

81. Furthermore, all of the persons who heard the defamatory statements understood that they referred to the Plaintiff.

### Defendant Levine's Defamatory Publications

82. Defendant Levine published a dismissal letter containing false statements. The relevant parts of the letter read as follows:

- "You exhibited a concerning lack of recognition of critically ill patients and, in at least one, delayed standard-of-care therapies while awaiting administration of a non-evidence-based, non-peer reviewed therapy for use in this situation. Additionally, you were dismissive of other members of the care team regarding patient's acute respiratory distress;

- You have exhibited a repeated pattern of defensiveness when corrected, and resistance to incorporating the Training Program's instruction into your practice;

- You have disregarded the thoughts and opinions of the other members of the care team by continuing to write orders on a jointly managed, critically ill patient without discussing such care;

- You had an additional episode of a negative interpersonal interaction with a team member regarding the above lack of communication; and

- You provided patient care outside the scope of the Training Program, despite receiving counseling against this.

- You have engaged in, and invited disruption of, the Training Program and, despite counseling, have continued to exhibit behavior that is disruptive to the Program, Program faculty and Colleagues; and

- You have spoken with a disparaging attitude with members of our Program and ancillary staff."

83. A copy of the letters containing the defamatory statement is attached as Exhibit A and is incorporated into this Original Complaint..

**Statements Were False**

84. The defamatory statements set forth above are false. The truth is that the Plaintiff did not act in the way described in the letter. However, he was told that if he continued to pursue the matter that he would be retaliated against.

**Statements Were Made With Culpable State of Mind**

85. The defendant Levine was the author of the letter and acted wrongfully in the publication of the defamatory statements in that she recklessly failed to check the accuracy of the statements. She further acted wrongfully in the publication of the defamatory statements in that it

permitted the statements to be published even though she knew or should have known that the defamatory statements were likely to be inaccurate.

### Statements Were Made With Actual Malice

86. Furthermore, Defendant published the defamatory statements with actual malice, in that they either knew that they were false or they acted with reckless disregard as to the truth or falsity of the statements.

87. The publication of the defamatory statements was not privileged because the statements were recklessly made.

88. The defendants published the defamatory statements with actual malice because she had substantial grounds for knowing they might be false but recklessly disregarded whether they were true or false.

### Statements Were Published

89. On February 14, 2022, Defendant Levine published the defamatory statements set out above when they sent the statements to Plaintiff's commanding officers. All of the persons who read the defamatory statements understood that the statements were defamatory in the manner described above.

90. Furthermore, all of the persons who read the defamatory statements understood that they referred to the Plaintiff.

**Plaintiff Enjoyed an Outstanding Professional Reputation Prior to Statements**

91. The Plaintiff has resided in San Antonio, Bexar County, Texas, for the past three years, and has served in the United States Air Force for the past 10 years. Prior to the publication of the defamatory statement described above, the Plaintiff enjoyed a reputation for outstanding military service, excellent Performance Reports, and outstanding work as a physician.

92. He was chosen as a clinic chief twice during his residency, a recognition of his good work, had multiple medical publications and two awards for his research during the residency.

### Plaintiff's General Damages

93. As a direct and proximate result of the Defendants Bansal and Levine's publication of the defamatory statements, the Plaintiff's reputation has been severely injured. The defamatory statements have caused the Plaintiff to suffer extreme mental anguish, public humiliation, and embarrassment.

94. The plaintiff seeks damages for these injuries in an amount within the jurisdiction of this court.

### Plaintiff's Special Damages

95. At the time of the publication of the defamatory statements, the Plaintiff was in line to receive a promotion to a chief of Nephrology Position at a military hospital. He was also going to receive critical care jobs with a corresponding salary of at least $300,000.00 per year and would have his choice of deployment locations.

96. As a direct and proximate result of the defendant's publication of the defamatory statements, Plaintiff did not receive the Chief of Nephrology position or the Critical Care jobs. He also lost his preferred deployment location.

97. Because of the publication of the defamatory statements, and their effect on the plaintiff's reputation, the Plaintiff did not receive an Officer Performance Report for 2022, which is damaging to his military career.

98. The publication of the defamatory statements caused severe mental anguish as Plaintiff had his superiors repeatedly told that he had violated the fundamental responsibilities that

he had as a doctor. He further experienced depression, anxiety, and insomnia as a result of having seen patients get harmed due to improper treatment.

## VIII.
## JURY DEMAND

99. Plaintiff further demands a trial by jury. A jury fee has been tendered.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff, Sean Barnett, respectfully prays that the Defendants be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for the Plaintiff against Defendants for damages in an amount within the jurisdictional limits of the Court; together with interest as allowed by law; attorney fees and costs of court; and such other and further relief to which the Plaintiff may be entitled at law or in equity.

Respectfully submitted,

By: __/s/Adam Poncio__

**ADAM PONCIO**
**State Bar No. 16109800**
**ALAN BRAUN**
**State Bar No. 24054488**
**PONCIO LAW OFFICES, P.C.**
**A Professional Corporation**
**5410 Fredericksburg Rd., Suite 109**

**San Antonio, Texas 78229-3550**
**Telephone: (210) 212-7979**
**Facsimile: (210) 212-5880**

**ATTORNEYS FOR PLAINTIFF**